**CAUSE NO.** 18-08-11048

| ELIZABETH GLASSMANN, | § | IN THE DISTRICT COURT |
|---|---|---|
| JESSE GLASSMANN, | § | |
| JULIE WHITING, | § | Montgomery County - 284th Judicial District Court |
| CRAIG WHITING, | § | |
| All individually and as next | § | |
| best friends of: James Glassmann, | § | **JUDICIAL DISTRICT** |
| Zoe Glassmann and Eliana Glassmann, | § | |
| Children, who also join Individually | § | |
| vs. | § | |
| | § | |
| BRENDA LARA, etal | § | MONTGOMERY COUNTY, TEXAS |
| | § | |

## ORIGINAL PETITION

COMES NOW, **ELIZABETH GLASSMANN, et al,** Plaintiffs in the above-styled and numbered cause complaining of **BRENDA LARA, et al,** and for cause of action respectfully show this honorable court and jury as follows:

### Discovery Plan

1. Discovery is intended to be conducted under Level 2 of Texas Rules of Civil Procedure 190.

### Parties

2. Plaintiffs: **Elizabeth Glassmann, Jesse Glassmann, Julie Whiting, Craig Whiting; all Individually and as next best friend of Children: James Glassmann, Zoe Glassmann and Eliana Glassmann, who also join Individually**.

3. **Defendants:**

1) Brenda Lara, Defendant, who may be served at: 2017 N. Frazier Street, Conroe, Texas 77301, or wherever she may be found;

2) Kim Anderson (a/k/a Kimberly Anderson Calcote), Defendant, who may be served at: 2017 N. Frazier Street, Conroe, Texas 77301, or wherever she may be found;

3) Kim Rogers-Porter, Defendant, who may be served at: 2017 N. Frazier

Street, Conroe, Texas 77301, or wherever she may be found;

4)      Whalenniel Grant-Billy, Defendant, who may be served at: 2017 N. Frazier Street, Conroe, Texas 77301, or wherever she may be found;

5)      Aaron Fincham, Defendant, who may be served at: 2017 N. Frazier Street, Conroe, Texas 77301, or wherever he may be found;

6)      Blair Bradley, Defendant, who may be served at: 2017 N. Frazier Street, Conroe, Texas 77301, or wherever she may be found;

7)      Heather Vaughn, Defendant, who may be served at: 2607 Yupon Street, Houston, Texas 77006, or wherever she may be found;

8)      Sandra Westcott, Defendant, who may be served at: 412 W. Phillips Street, Suite 107, Conroe, Texas 77301, or wherever she may be found;

9)      Patti Sexton, Defendant, who may be served at: 412 W. Phillips Street, Suite 107, Conroe, Texas 77301, or wherever she may be found;

10)     Rebecca Girardet, Defendant, who may be served at: Texas Children's Hospital, 6621 Fannin Street, Houston, Texas 77030

## Jurisdiction

4.      The acts complained of occurred in Montgomery County, Texas and therefore, venue is proper in Montgomery County, Texas under the provisions of the Civil Practice and Remedies Code. Moreover, by reason thereof, jurisdiction is proper in any Court with Jurisdiction over said matters in Montgomery County, Texas.

## Statement of the Case

5.      This case involves the Glassmann family: parents, Jesse Glassmann and Elizabeth Glassmann; Children, James Glassmann, Zoe Glassmann and Eliana Glassmann; and Grandparents, Julie Whiting and Craig Whiting. Jesse is a Staff Sargent in the United States Army. Prior to being stationed in the Houston area, Jesse was stationed in Washington State. During his time in Washington, Jesse was deployed to Afghanistan. During periods of deployment Elizabeth and the Children would return to Minnesota. The Glassmann's extended family are from Minnesota. In August of 2015 Jesse and family moved to the Houston area where he began his duties as an Army recruiter.

6.      Eliana Glassmann is a wonderful and exciting little girl. Since the early times in

her life Eliana suffered from blood sugar inconsistencies. From just past the age of one-year old Eliana had been taken to the doctor to try to determine why she was experiencing these blood sugar inconsistencies. The family began this quest by first going through their family physician. From there Eliana was referred to specialists to help with the diagnosis. A number of different specialists were used, and a number of different tests were conducted. During this process the specialists had begun listing and eliminating possible reasons. Unfortunately, even after all the efforts of these doctors, Eliana continued to experience these potentially life-threatening blood sugar incidents. The Glassmanns reached out to their family and determined that they wanted to see if specialists at the world-renowned Mayo Clinic would be able to assist in the diagnosis. Elizabeth took the children to Minnesota so that Eliana could be evaluated. Different measures were employed to assist the parents in identifying and preventing any blood sugar incident that could be harmful to the child. The family eventually purchased a specialty dog to help identify potentially dangerous conditions. The family learned as much as possible to treat the incidents. The family continued to consult specialists to identify the cause of the blood sugar incidents.

7.    In August 2015 the Glassmanns moved to the Houston area. When they arrived, the family sought out new local doctors and specialists to continue Eliana's treatment. By this time Eliana had suffered several life-threatening low blood sugar incidents. The family employed multiple specialists, including endocrinologist and gastrologist, to diagnose the problem and to create treatment strategies to help prevent subsequent incidents. One of the specialists prescribed medication for Eliana which was designed to stabilize her blood sugar by affecting the body's ability to produce insulin. In March 2017 the specialist took Eliana off the medication. The family monitored Eliana's blood sugar level, gave prescribed medicine, followed recommended dietary strategies, and employed the entire wisdom of their family.

Sadly, even employing these efforts, Elaina suffered another low blood sugar incident. The family employed the learned protocol and rushed Eliana to the hospital. Eliana was admitted to the hospital in the Woodlands and then transferred to Memorial Hermann in the Houston Medical Center. Doctor Rebecca Girardet was the lead doctor for the hospital's abuse team. After conducting some testing, the Memorial doctors considered some of the test results to be odd. The tests showed a critically low blood sugar level and high insulin levels. The family had kept a very detailed record of their efforts with the child's health and presented those records to the doctors for their review. The Parents also asked the Dr. Girardet and other doctors to consult with the child's local specialists. The Dr. Girardet and other doctors could not explain this type of test result. Dr. Girardet's team ran tests that determined that no unusual drugs were in the child's system. Dr. Girardet's team attempted to run tests on the child's insulin make up at the time of admission in the Woodlands, but there was no sample to test – tests were run by Dr. Girardet's team at Memorial that showed no foreign insulin. There were no other tests that indicated the child had any type of foreign insulin in her system.

8.    Dr. Girardet's team was concerned because they could not reproduce the child's low blood sugar problem in the hospital. Dr. Girardet's team did not attempt to contact any of the previous treating physicians or local specialists. During this time frame Dr. Girardet's team conducted a lot of the same tests that had been previously conducted. Even though the doctors could not verify any wrong doing by the parents, investigator Kimberly Anderson Calcote claimed that Dr. Girardet reported that the child would be in danger of harm or death if returned to the mother. TDFPS began its investigation by contacting the doctors at the hospital and getting the background information. TDFPS also contacted the parents. When TDFPS investigator Kimberly Anderson Calcote contacted the parents at the hospital she failed to inform

them that she was investigation allegations against the parents and failed to provide an informational pamphlet which she was required to do in accordance with the Child Protective Services Handbook ("CPS" and "The Handbook"). At this point, neither Dr. Girardet nor TDFPS had consulted with Eliana's local specialists. Eliana remained in the hospital for about 10 days. The doctors remained puzzled as to the cause of the low blood sugar incident. When questioned later multiple doctors, including doctor Heather Vaughn, the Volunteer Court Appointed Special Advocate, stated that there were generally three ways that a person could cause a child to suffer a low blood sugar incident. Those ways were: starve the child for a long period of time, give the child medication (like for a diabetic), or give the child foreign insulin. During the investigation it was learned that the family had guests at the house for a barbeque the day of the incident and that the child ate well. TDFPS continued their investigation and the police got involved; both of whom came to the Glassmann home and conducted a search of the residence for any type of substance that would cause harm to Eliana. The police confiscated all the medication in the home; nothing was identified that could have caused Eliana's blood sugar problems. Some of the medication taken, over the objection of the parents and at the insistence of TDFPS, was that belonging to James Glassmann. TDFPS investigator Kimberly Anderson Calcote was made aware that James was seeing a doctor and taking medication for severe mental issues and that taking the medication would detrimentally affect his treatment and progress. Ms. Kimberly Anderson Calcote was told that James suffered from and was diagnosed with ADHD, Anxiety Disorder and Disruptive Mood Dysregulation Disorder; he needed his medication for school and to maintain his mental health. Ms. Kimberly Anderson Calcote ignored these warnings and had the police confiscate all the family's medications. Prior to any of the following restriction being put in place and prior to the requested removal, the matter would have had to

staffed and approved by investigation supervisor Aaron Fincham and program director Blair Bradley – in accordance with the CPS policy. Additionally, prior to the restrictions and removal CPS was to consider the needs, effect on and safety of ALL the children – in accordance with CPS policy. It appears that all members of the CPS investigation team did not follow proper policies and procedures. During most of the investigation the parents were permitted unrestricted access to the child. Later there were some restriction put in place wherein the mother was supervised. TDFPS investigator Kimberly Anderson Calcote met with Jesse and other family members to discuss a safety plan while TDFPS was conducting their investigation. The safety plan called for Jesse and Mona Glassmann (paternal grandmother – who is also an emergency medical technician) to supervise Elizabeth around the children during the investigation – at the marital residence. The family cooperated fully with TDFPS' requests and completely informed TDFPS of the child's medical background and all the efforts the family was making to protect the child. TDFPS' investigation seemed to be centered around Elizabeth. TDFPS' asked that Jesse and Julie Whiting (maternal grandmother – who is also a retired CPS caseworker) supervise Elizabeth around the children while they were conducting the investigation; the family complied with all requests. During the investigation the family visited with Eliana everyday while at the hospital until TDFPS prevented them from doing so. It is well founded that parents have a constitutional right to raise their children. It is CPS policy to use the least restrictive means to provide protection for the children. Keeping in mind that the investigation team had agreed to allow Mr. Glassmann and the Grandmother to supervise Mrs. Glassmann during the investigation phase; the investigation team had many options available at this point: 1. They could have continued to allow the current supervision, 2. If the investigation team believed that Ms. Glassmann had done some harm, they could have asked to have the mother move to another

location, 3. If the investigation team believed that the parents had some harm, they could have asked the parents to leave the home and have the grandmothers care for the children, 4. They could have asked the grandparents to take to children to another home and care for them, 5. They could have asked for a formal Family Based Safety Service plan with some services. Instead, the investigation team choose to violate these parents' constitutional right and ignore CPS policies. The investigation team choose not to consider any less restrictive measures prior to snatching the children from their parents. On or about April 27, 2017, when the parents returned to the hospital the hospital social worker informed the parents that TDFPS had placed Eliana in the care of the hospital and that the parents were forbidden, by TDFPS, from seeing their daughter. The parents asked the social worker to see the court order that permitted both TDFPS and the hospital to violate their constitutional right to see and be with their daughter. The social worker said they were not obligated to show the parents any paperwork.

   9.  The hospital informed TDFPS that the child was ready to be discharged and TDFPS asked the hospital to keep the child until they had a chance to process the paperwork to take possession of the child. Unbeknownst to the Glassmanns, TDFPS had completed an emergency affidavit and filed an emergency removal petition with the Court asking for an emergency removal of all three of the children. It doesn't appear that Ms. Calcote ever asked Dr. Girardet if a parent would have the ability to create this situation. Ms. Calcote did state that Dr. Girardet told her that it was the mother was the wrong doer. On May 1, 2017 Kimberly Anderson Calcote swore out an affidavit in support of the emergency removal wherein she made false statements that were intended to be relied upon by the court in making the emergency removal determination – the CPS Cluster Court of Montgomery County, Texas – the court that serves at the pleasure of TDFPS. In the affidavit it was stated that hospitals had determined that

the hypoglycemia only occurred in the emergency room – that statement is nowhere in the records.  The affidavit stated that the hospital would not release the child without a CPS safety plan in place – that is not contained in any records.  The affidavit states that the child's initial lab results are consistent excess insulin – that is not in the records, in fact it was stated that the hospital conducted insulin tests and did not find anything unusual and that there was no test conducted at the initial hospital. The affidavit stated that evidence found at the home warranted further investigation by the Montgomery County Police Department – there was no medications found that was not prescribed nor was there any insulin found at the house.   The CPS investigation team all the way through and up to the program director reviewed this affidavit and had to have approved the removal request – as required by CPS policy.  The medical records were very clear that the child's medical condition was unexplainable; there were some theories that could not have been done by the parents, and if something did happen to the child – the doctors could not identify who may have/could have done it.  Additionally, the affidavit makes no claims of abuse to the other two children nor does it make any claim that Mr. Glassmann had anything to do with what might have happened; this is also supported by CPS asking Mr. Glassmann to supervise the children in the home.  It is uncertain as to when TDFPS investigator Kimberly Anderson Calcote had conducted an initial interview of James and Zoe – there is no known video recording, as is required.  The Court signed the Emergency Removal Order on May 2, 2017.  On May 4, 2017 the parents were forced out of the hospital by local police.  Julie had gone to the school to pick up James and Zoe and was told that she could not because CPS had taken possession of the children.  The school was asked to produce a court order giving them and CPS the authority to pick up the children.  The school officials stated that they were not given any order, simply told by CPS that CPS was taking custody of the children.  To this point James

and Zoe had been living in the home with the parents and grandparents (at times) and there were absolutely no indications of any harm to these two children.

10.     With the approval of the CPS investigation supervisors, TDFPS investigator Kimberly Anderson Calcote took possession of the all the children knowing that anyone she would have to get approval from for any type of placement arrangement would not be available for consultation after 5pm, once again against CPS policy.  At approximately 3:30pm on May 4, 2017, TDFPS investigator Kimberly Anderson Calcote told the parents that the children were being taken to the CPS office in Conroe and that they must come up to the office for a meeting. The children had already been brought to the CPS office by a stranger and placed in a strange room.  James had already begun to show signs of mental agitation.  The parents had contacted their attorney and everyone rushed to the CPS office.  The meeting began around 5:00pm and was attended by: Jesse Glassmann, Elizabeth Glassmann, Julie Whiting (maternal grandmother), Mona Glassmann (paternal grandmother), attorney Geric Tipsword, TDFPS investigator Kimberly Anderson Calcote, TDFPS investigative supervisor Aaron Fincham, and another CPS staff member.  CPS told the parents that they had taken possession of all of the children because the doctors had told CPS that Elizabeth had done "something" to Eliana to cause the low blood sugar incident and that this was a case of "Munchhausen by Proxy" – which was later discovered to by false in that the doctors could not determine who, if anyone, did something to the child and the doctors had never said that the mother had any such disorder.  To this point the mother had not been evaluated by anyone, nor was she asked to be evaluated.  To this point Ms. Calcote and Mr. Fincham had not consulted with any of the children's specialists.  At this point, TDFPS knew that they were going to place the children in foster care even though there were capable family members to care for the children.  This is in direct violation of The Handbook. Mr.

Tipsword (seasoned veteran of CPS defense work) ("Tipsword"), the Glassmanns' attorney, offered different scenarios for the protection of the children without the need for foster care. Tipsword and the family gave very stern and emotional warnings to Calcote and Fincham as to James' mental and psychological conditions – and told Calcote and Fincham emphatically that if James were placed in foster care "it would destroy him". The investigation team was put on notice that any disruption in James' routine would have catastrophic effects on James especially since Calcote had order the removal of James' medication from the house. Tipsword suggested that if the investigation team had concerns with the mother that she could leave the home for as long as necessary; this was summarily rejected without conferring with the program director. Tipsword also suggested that the parents could move out of the home and have the two grandmothers in the home to care for the children; this was summarily rejected without conferring with the program director. Ms. Calcote and Mr. Fincham stated that was not acceptable because the parents would still have rights to enter the house – which made no sense because the safety plan was issued without this concern. Tipsword said that the parents would execute a lease right there and then to alleviate that concern; Ms. Calcote and Mr. Fincham summarily rejected without conferring with the program director. Tipsword asked if they would consult the director and any attorney that could approve these plans. Tipsword also asked why Calcote and Fincham had not offered a family-based safety service plan being that the family had been supervising up to this point; Ms. Calcote and Mr. Fincham could not explain why this option was not sought prior to the investigation team abducting the children – The Handbook states in many places that the least restrictive methods are to be used. Ms. Calcote and Mr. Fincham stated that there were no other options other than the children being placed in foster care until the next hear – two weeks away. What Ms. Calcote and Mr. Fincham failed to mention

was that the children were going to be spending the night in the CPS office. The children were placed in a foster home and after one day James was admitted to a psychiatric hospital for evaluation where he remained for about a week. While at the hospital James suffered physical injuries and was given medication that was not approved by the parents. Before Ms. Calcote and Mr. Fincham took possession of James he had never been admitted to any psychiatric hospital. Just as was warned and with Ms. Calcote and Mr. Fincham's full knowledge, when James was placed in a stranger's home the effects were catastrophic and caused severe trauma which resulted in extreme emotional distress to the child. Zoe and Elaina both reported terrible conditions in the foster home and unsanitary treatment by the foster parents. After Ms. Calcote took the children from the school and hospital and kept them in the CPS office and then placing them in foster care, the children were very afraid of being approached by anyone not part of their family. The children's attorney, the parents, and the grandparents told the caseworker and the CASA supervisor and CASA volunteer about this fear throughout the case. The children exhibit negative emotional behaviors after every time any of the aforementioned individuals attempted to or actually did take the children out of their normal environment.

11. After a long very difficult period of time the case was presented to the court for consideration. During the hearing no evidence was presented that anyone had abused or neglected Zoe or James – other than the actions of CPS workers. At the end of the hearing Ms. Calcote requested that the court appoint CPS as the temporary managing conservator of all three children. The court granted the request and at the same time the court ordered the children to be returned to their home to live with the grandparents; just as what was suggested in the meeting almost two weeks prior. The parents asked for as much time with the children as possible. Ms. Calcote and the rest of the investigation team requested only supervised visitation at the CPS

office – even though they knew that the children wanted to be with the parents, they knew that there was no evidence of abuse or neglect with Zoe and James, they knew that James had suffered a horrible trauma and needed his routine, and even though they knew that no one could positively determine what had happened to Eliana. The court appointed attorney ad litem ("AAL") and a guardian ad litem ("GAL") for the children. Court Appointed Special Advocates ("CASA") was appointed as the guardian ad litem of the children. The role of the GAL is to look after the best interest of the children and provide information to the court related to their best interest. CASA selected Patti Sexton and Sandra Westcott as the supervisors and Dr. Heather Vaughn as the volunteer. Dr. Vaughn is a pediatric doctor. The GAL team ignored this tremendous responsibility. The GAL team continued to attempt and meet with the children when they knew the children were afraid of them and were afraid that they were going to be taken again. The GAL team failed to recognize James' educational needs and get the proper accommodations through the school – the parents and grandparents were forced to hire an education lawyer to make sure that James' educational rights were not being violated.

12.     Due to the investigation team's failure to follow procedure and willingness to violate the parents' right, the grandparents were forced to make accommodations. The parents and grandparents were forced to pay for a second home. The grandparents were forced to purchase a car to transport the children. The grandparents were forced to change their entire life. During the next few months the case was transferred to the next department in CPS and caseworker Brenda Lara and her supervisors were assigned to the case. A family service plan was created for the parents and permanency goals were established. Even though CPS' primary goal is to protect children and reunite families, Ms. Lara and her supervisors determined that the goal for these kids should be relative conservatorship or relative adoption – essentially, the

parents had already been eliminated from consideration – still no evidence that Mr. Glassmann had done anything wrong and only speculation as to Mrs. Glassmann.  Ms. Lara and her supervisors had apparently determined that these parents were 'guilty' and their children should never be returned to them.  This decision was made prior to any type of psychiatric evaluation, prior to any direct evidence against the parents, prior to any criminal charges being filed, and prior to the parents having the opportunity to complete required services.  The parents quickly completed all requested services and continued in counseling until released by the counselor.  As the months passed the parents continued to request additional time with their children.  During this time the interaction between parents and children was perfect with no negative report.  The children clearly expressed to the AAL and the GAL that they wanted more time with their parents.  The GAL team continued to ignore the best interest of the children as to their emotional wellbeing.  Additionally, during this time no new evidence was presented that the parents had done anything wrong.  In fact and believed to have been at the insistence of the caseworker and the GAL, during this time law enforcement received a warrant to do a hair follicle drug test on Eliana to determine if she had been given any type of drugs.  This is believed because the warrant came just a day after the family court denied the caseworker and GAL's request for the same test.  Interestingly, results that would normally take a week to return were never presented to the parents and the caseworker and GAL said they didn't have the results.  This was the crux of their case – mom had given the child of foreign substance.  Law enforcement never even interviewed the parents as part of their investigation.

13.    As the case continued the parents continued to ask the court for additional time with the children.  Ms. Lara refused to agree to any additional time even though there was no specific reason why – she was always 'concerned'.  The GAL team fought against any additional

time even if the additional time was supervised – they knew that the children wanted more time. This behavior was egregious especially when they fought against the parents being able to come to the house early for Christmas morning so that they could be there when the children woke up. The egregious behavior continued when the GAL began stalking the neighborhood, so much so that the neighbors became fearful of a stranger parked near the house watching the children. Dr. Vaughn later confirmed that it was her. Both Ms. Lara and Dr. Vaughn continued to torment the children by visiting them at school and trying to be alone with the children – they knew that the children were afraid of them and were afraid of being taken from school again. The effects of James' trauma were evident and were being clearly demonstrated both at home and at school. The school records showed that James' behaviors, including violence and suicide, were extreme and were elevated after the investigation team's actions and the investigation team's ignoring of James' mental health conditions.

14.     Eventually the parents completed their psychological evaluation where in neither parent was found to have abusive traits. Ms. Lara and the GAL team reviewed these documents and continued to fight against the parent being around the children. During this entire time Ms. Lara is required to continue evaluate the permanency goals for the parents; the goals were never changed. Ms. Lara and Dr. Vaugh continued to fight to have James' psychiatrist changed and eventually the court ordered a second opinion – which concurred; of course James had to be put through the trauma of another evaluation by a stranger. Depositions were conducted, and all relevant persons were deposed. Ms. Lara stated that the parent had completed everything and that there was no evidence of harm by Mr. Glassmann. Ms. Lara also stated that she thought kids could go home if there was more counseling; but that was never formally offered to the parents. Dr. Vaughn was deposed wherein she could not figure out how a parent could have caused

Eliana's condition.  Dr. Vaughn also stated that she believed that a parent who did not pursue counseling for a child (when no one had recommended counseling) was abuse, in her opinion – demonstrating her bias – not looking out for the best interest of the children but pursuing her own agenda.  As her supervisors both Sandra Westcott and Patti Sexton supported Dr. Vaughn's position.  The head of the treatment team for Elaina was deposed and stated that at the time of making the referral they had not conferred with any of Eliana's specialists.  Additionally, the doctor could not determine how a parent would know how to create Eliana's condition.

15.     During the case the parents present many different options to Ms. Lara and Dr. Vaughn as to how the children can be returned to the parent so that the interaction could be monitored.  Ms. Lara and Dr. Vaughn continued to fight all suggestions relying on the statement that the parents were 'under investigation' by law enforcement; they knew that no charges had been filed, no drug test confirmed any wrong doing and the parents were never brought in for questioning.  It was thought that some how there was a type of conspiracy wherein Ms. Lara and Dr. Vaughn was encouraging law enforcement to keep the investigation open by providing speculative information.  The parents suggested that they could return to the home and live with both grandparents and children – NO. The parents suggested additional periods of supervised time with the kids at or away from the home to demonstrate trustworthiness – NO.  The parents suggested short periods of unsupervised time – NO.  Neither Ms. Lara nor Dr. Vaughn suggested any scenario where the children could be reunited with the parents; even though still nothing had been proven against the parents, there had been zero negative reports regarding the parents and the children continued to want the parents to come home.

16.     As the case was coming to the end the parties participated in mediation, but it was clear that Ms. Lara and Dr. Vaughn were not there in good faith as they had no offer that

included the kids being return to the parents. The attorney for the children had always been in favor of the children and parents being reunited. A jury trial was scheduled and on the eve of trial the parents presented an option that they truly didn't want. They made the offer, which was eventually accepted, because they felt bullied and worried about the risk of trial. Even though no one proved any wrong doing, the Glassmanns ended spending about seventy-five thousand dollars to defend against this unwarranted and personal attack by the respondents.

## Causes of Action

### Abuse of Process

17.    Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 16. The Defendants abused the process when:

   1)    The Plaintiff was served with valid process;
   2)    The Defendants made an illegal, improper or perverted use of the process after it was issued;
   3)    The Defendant had an ulterior motive in using the process; and
   4)    The Plaintiffs suffered injury as a result of the improper use.

18.    The plaintiff was served with the petition to terminate the parental rights. The defendants used this process to improperly take possession of children who were not in any danger. The defendants used the process for the ulterior motive of preventing a child from being released from the hospital and from being returned to a father that had done nothing wrong. The children suffered the emotional distress of being separated from their parents. James suffered extreme emotional distress as evident by his admission to the psychiatric hospital. The parents also suffered monetary damage from having to defend against this case.

19.    Plaintiffs are entitled to damages caused as a result of Defendants' abuse of Process, which damages are within the jurisdictional limits of this Court, attorney's fees in all court levels. The Defendants are joint and severally liable for the damages.

## Assault – Infliction of Bodily Injury

20.     Plaintiff incorporates by reference the factual statements set forth in Paragraphs 1 through 19 above.

21.     Defendant committed the assault directly or vicariously when:

1)      The Defendants acted intentionally, knowingly or recklessly;
2)      The Defendants made contact with the plaintiff's person; and
3)      The Defendants' contact caused bodily injury to the plaintiff.

22.     Defendants knowingly placed the children in foster care.  The foster family was acting as an agent of Ms. Calcote and the investigation team.  The psychiatric hospital was acting as an agent of Ms. Calcote and the investigation team.  When Ms. Calcote placed James in foster care she knew that it would cause him mental harm.  James had a breakdown and was taken to the hospital.  At the hospital James sustained an injury.

23.     Plaintiff has been damaged in an amount within the jurisdictional limits of this court.  The actions of Defendant were intentional and made with knowing disregard for the rights of the Plaintiff.  Consequently, Plaintiff prays for punitive damages in addition to compensatory damages.  The Defendants are joint and severally liable for the damages.

## False Imprisonment

24.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 23.

25.     The Defendants falsely imprisoned the plaintiffs when:

1)      The Defendants willfully detained the plaintiffs;
2)      The detention was without the plaintiffs' consent; and
3)      The detention was without legal authority or justification.

26.     The defendants willfully and purposely took possession of the children without the plaintiffs' consent.   The Defendants did not present any court order when they took

possession of the children at the school.  The Defendants instructed the hospital to prevent the Plaintiffs from seeing and retrieving their child.  The child was taken from the hospital without presenting a court order.  The children were taken in a non-exigent circumstance situation.

27.     Plaintiff has been damaged in an amount within the jurisdictional limits of this court.  The actions of Defendant were intentional and made with knowing disregard for the rights of the Plaintiff.  Consequently, Plaintiff prays for punitive damages in addition to compensatory damages.  The Defendants are joint and severally liable for the damages.

**Breach of Fiduciary Duty**

28.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 27.

29.     The defendants breached their fiduciary duty when:

    1)     The plaintiffs and defendants had a fiduciary relationship;
    2)     The defendants breached its fiduciary duty to the plaintiff; and
    3)     The defendant's breach resulted in in jury to the plaintiffs.

30.     The plaintiffs and defendants had a fiduciary created by law.  The defendants had a fiduciary duty to protect the children, to perform a thorough investigation and to use the least restrictive measures to protect the children.  The defendants breached the duty by not using the least restrictive means necessary to protect the children.  The defendants also breached the duty by placing James in foster care when they knew of his mental condition.  The children suffered the emotional distress of being separated from their parents.  James suffered extreme emotional distress as evident by his admission to the psychiatric hospital.  The parents also suffered monetary damage from having to defend against this case.

31.     Plaintiff has been damaged in an amount within the jurisdictional limits of this court.  The actions of Defendant were intentional and made with knowing disregard for the rights

of the Plaintiff.  Consequently, Plaintiff prays for punitive damages in addition to compensatory damages.  The Defendants are joint and severally liable for the damages.

### Intentional Infliction of Emotional Distress

32.    Plaintiffs incorporates herein by reference the factual statements set out in Paragraphs 1 through 31.

33.    The Defendants intentionally inflicted emotional distress when:

1)    The plaintiff is a person;
2)     The defendants acted intentionally or recklessly;
3)    The emotional distress suffered by the plaintiff was severe;
4)    The defendants' conduct was extreme and outrageous;
5)     The defendants' conduct proximately caused the plaintiff's emotional distress; and
6)    No alternative cause of action would provide a remedy for the severe emotional distress caused by the defendant's conduct.

34.    The plaintiff was served with the petition to terminate the parental rights.  The defendants used this process to improperly take possession of children who were not in any danger.  The defendants used the process for the ulterior motive of preventing a child from being released from the hospital and from being returned to a father that had done nothing wrong.  The children suffered the emotional distress of being separated from their parents.  James suffered extreme emotional distress as evident by his admission to the psychiatric hospital.  The defendants willfully and purposely took possession of the children without the plaintiffs' consent.  The Defendants did not present any court order when they took possession of the children at the school.  Dr. Girardet chose not to tell Ms. Calcote that there were only three ways that a parent could create this situation and that these parents could not have created this situation.  Dr. Girardet's purposeful actions helped create the situations necessary to cause the distress.  The Defendants instructed the hospital to prevent the Plaintiffs from seeing and retrieving their child.

The child was taken from the hospital without presenting a court order. The children were taken in a non-exigent circumstance situation. The plaintiffs and defendants had a fiduciary created by law. The defendants had a fiduciary duty to protect the children, to perform a thorough investigation and to use the least restrictive measures to protect the children. The defendants breached the duty by not using the least restrictive means necessary to protect the children. The defendants also breached the duty by placing James in foster care when they knew of his mental condition. The children suffered the emotional distress of being separated from their parents. James suffered extreme emotional distress as evident by his admission to the psychiatric hospital. The parents suffered extreme emotional distress being separated from their children, not know where they were, and learning that James had been admitted to the hospital where he sustained injuries. The parents also suffered monetary damage from having to defend against this case.

35.     As a proximate result conduct of the Defendant, Plaintiff has been damaged in an amount within the jurisdictional limits of this court, for which she seeks recovery as compensatory damages. The actions of Defendant were intentional and made with knowing disregard for the rights of the Plaintiff. Consequently, Plaintiff prays for punitive damages in addition to compensatory damages. The Defendants are joint and severally liable for the damages.

**Negligence**

36.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 35.

37.     The defendants were negligent when:

      1)    The defendant owed a legal duty to the plaintiff;
      2)    The defendant breached the duty; and
      3)    The breach proximately caused the plaintiffs' injury.

38.     The plaintiff was served with the petition to terminate the parental rights.  The defendants used this process to improperly take possession of children who were not in any danger.  Dr. Girardet should have consulted with the child's specialists prior to concluding there was wrong doing by the parents.  Dr. Girardet knew or should have known that not telling Ms. Calcote that there were only three ways that a parent could create this situation and that these parents could not have created this situation would lead to harm to the children and the family. Dr. Girardet's negligent actions helped create the situations necessary to cause the distress.  The defendants used the process for the ulterior motive of preventing a child from being released from the hospital and from being returned to a father that had done nothing wrong.  The children suffered the emotional distress of being separated from their parents.  James suffered extreme emotional distress as evident by his admission to the psychiatric hospital.  The defendants willfully and purposely took possession of the children without the plaintiffs' consent.  The Defendants did not present any court order when they took possession of the children at the school.  The Defendants instructed the hospital to prevent the Plaintiffs from seeing and retrieving their child.  The child was taken from the hospital without presenting a court order. The children were taken in a non-exigent circumstance situation.  The plaintiffs and defendants had a fiduciary created by law.  The defendants had a fiduciary duty to protect the children, to perform a thorough investigation and to use the least restrictive measures to protect the children. The defendants breached the duty by not using the least restrictive means necessary to protect the children.  The defendants also breached the duty by placing James in foster care when they knew of his mental condition.  The children suffered the emotional distress of being separated from their parents.  James suffered extreme emotional distress as evident by his admission to the psychiatric hospital.  The parents suffered extreme emotional distress being separated from their

children, not know where they were, and learning that James had been admitted to the hospital where he sustained injuries. The parents also suffered monetary damage from having to defend against this case. Plaintiffs will show that Defendants failed to employ adequate business practices to ensure that the children were protected, and the least restrictive means were used. The injuries and damages occurred as a direct and proximate result of the negligence of Defendant resulting in damages to Plaintiff. The damages to Plaintiff were proximately caused by the negligent conduct of Defendant.

39.     Each of these acts and omissions, singularly or in combination with others, constitutes a negligence which proximately caused Plaintiff's damages.

40.     Plaintiffs will prove on the trial of this case that they sustained damages as a direct and proximate result of the negligence of Defendants and will request that judgment be entered against Defendants in an amount within the jurisdictional limits of this court. The Defendants are joint and severally liable for the damages. Plaintiff sues for post-judgment interest at the greatest amount authorized by law and costs of court.

### Constitutional Violation

41.     Plaintiff incorporates herein by reference the factual statements set out in Paragraphs 1 through 40.

42.     Texas and US constitutional protect the rights of a parent to raise their children without undue interference from the government

43.     The defendants violated the constitutional rights of the plaintiffs when the plaintiff was served with the petition to terminate the parental rights. The defendants used this process to improperly take possession of children who were not in any danger. The defendants used the process for the ulterior motive of preventing a child from being released from the

hospital and from being returned to a father that had done nothing wrong. The children suffered the emotional distress of being separated from their parents. James suffered extreme emotional distress as evident by his admission to the psychiatric hospital. The defendants willfully and purposely took possession of the children without the plaintiffs' consent. The Defendants did not present any court order when they took possession of the children at the school. The Defendants instructed the hospital to prevent the Plaintiffs from seeing and retrieving their child. The child was taken from the hospital without presenting a court order. The children were taken in a non-exigent circumstance situation. The plaintiffs and defendants had a fiduciary created by law. The defendants had a fiduciary duty to protect the children, to perform a thorough investigation and to use the least restrictive measures to protect the children. The defendants breached the duty by not using the least restrictive means necessary to protect the children. The defendants also breached the duty by placing James in foster care when they knew of his mental condition. The children suffered the emotional distress of being separated from their parents. James suffered extreme emotional distress as evident by his admission to the psychiatric hospital. The parents suffered extreme emotional distress being separated from their children, not know where they were, and learning that James had been admitted to the hospital where he sustained injuries. The parents also suffered monetary damage from having to defend against this case.

### Attorney's Fees

44.     Plaintiff seeks reasonable attorney's fees and expenses for trial and/or appeal for this suit.

### Jury Demand

45.     Plaintiff requests a jury trial and pays the requisite jury fee.

**CONSIDERING THE ABOVE**, Plaintiffs, **Elizabeth Glassmann, et al** pray that:

(1)     Defendants be cited to appear and answer herein;

(2)     Plaintiff be granted Judgment for a fair and reasonable amount;

(3)     Plaintiff be granted punitive damages;

(4)     Plaintiff be granted post-judgment interest at the maximum liable rate by law;

(5)     Plaintiff be granted costs of court;

(6)     Plaintiff be granted reasonable attorney's fees both for trial and/or appeal and expenses; and

(7)     Plaintiff be granted any and other further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**THE TIPSWORD LAW FIRM, P.C.**

By: _____

Geric L. Tipsword
State Bar No. 24058685
2600 S. Loop W., Ste 420
Houston, Texas 77054
Telephone: 713.432.7884
Facsimile: 713.432.7885
Geric.Tipsword@TipswordLaw.com
**ATTORNEY FOR PLAINTIFFS**